UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREG PRICE O/BO
BJP, a minor,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

Civil Action No. 09-15017

HON. DENISE PAGE HOOD
U.S. District Judge

HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Greg Price brings this action on behalf of his minor son under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Childhood Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.

## PROCEDURAL HISTORY

Plaintiff, proceeding on behalf of his minor son ("Claimant"), applied for Childhood Supplemental Security Income on July 21, 2004, alleging disability as of August 28, 2000 (Tr. 93-95). On September 23, 2008 Administrative Law Judge ("ALJ") Paul Armstrong presided at an administrative hearing held in Flint, Michigan (Tr.23-44). Claimant and Plaintiff, represented by attorney Michael Plowman, testified. On March 2, 2009, ALJ Armstrong found Claimant not disabled. On November 3, 2009, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on December 28, 2009.

**BACKGROUND FACTS**

Claimant, born August 28, 1996, was 12 when ALJ Armstrong issued his decision (Tr. 93). Plaintiff originally alleged that his son was disabled as a result of attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD") and a bipolar disorder (Tr. 108).

**A. Claimant's Testimony**

Claimant, 12, reported that he was in sixth grade (Tr. 25). He stated that he wanted to play hockey professionally, noting that at present, his academic grades were "not looking too well" (Tr. 29). Claimant reported that he had three friends at school, but spent most of his free time staying at home watching television (Tr. 32). He added that he regularly stayed after school for tutoring (Tr. 33). He denied reports that he had threatened to kill himself in the previous year or that he had current thoughts of suicide (Tr. 33). He reported that a recent change from a charter school to a public school was "good" (Tr. 38).

**B. Testimony of Claimant's Father**

According to Plaintiff, in 2007, Claimant falsely claimed to have been beaten, but later admitted that he had made up the claim (Tr. 27). Plaintiff reported that his son "acted out" when placed in a group of kids (Tr. 28). He stated that he and his first wife (Claimant's biological mother) now shared joint custody of Claimant (Tr. 31). During Claimant's stays with his mother, Plaintiff acknowledged that he was able to quell Claimant's misbehavior with a short telephone conversation (Tr. 31). He expressed concern that he was still required to remind Claimant to wear deodorant and brush his teeth (Tr. 33). Plaintiff opined that his son engaged in manipulative behaviors in an effort to avoid being sent to his mother's house (Tr. 34).

In response to questioning by his attorney, Plaintiff reported that his son failed to pay attention in class, and as a result required help finishing his work every night (Tr. 36). He testified

that his son had gotten into trouble at his former school, but admitted that a school change was made for scheduling, rather than academic reasons (Tr. 37-38). He opined that medication adjustments had improved his son's condition (Tr. 38). He denied that his son experienced physical limitations (Tr. 39). He testified that because of his son's history of "acting out," he did not allow his son's friends to visit (Tr. 39). He indicated that when his son had tantrums, Claimant would either "bounc[e] his head off the wall" or bully others (Tr. 40). He reported that his son's last progress report consisted of two Bs, a D minus and an F (Tr. 41). He opined that his son's school problems stemmed from his reluctance to ask questions in class, stating that instead, his son asked him for help (Tr. 42). He noted that his son had repeated second grade (Tr. 42). He stated that his son typically read Harry Potter books, but otherwise did not enjoy reading (Tr. 43).

   C.    **Medical Evidence**

### 1. Treating Sources

A November, 2003 psychological assessment, noting defiance and hyperactivity, stated that Claimant "appear[ed] to be acting out as a result of problems between parents" (Tr. 160). Claimant's danger to others was assessed as "low" (Tr. 161). Claimant showed good communication skills and the ability to get along with his peers (Tr. 162). The assessor, diagnosing a "disruptive behavior disorder" and academic underachievement, assigned Claimant a GAF of 44[1] (Tr. 163). Prospective therapy goals included improving "compliance to [step] mom's directions" (Tr. 164).

---

[1] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

-3-

In October, 2004, WISC-III testing showed that Claimant's cognitive ability was "low average" (Tr. 198-200). March, 2005 counseling notes state that he was encouraged to tell the truth and continue to improve his academic performance (Tr. 293). September, 2005 treatment notes indicate that Claimant was doing well in school (Tr. 287). October, 2005 tutoring notes state that Claimant's reduced reading skills impaired his ability to keep up with his class (Tr. 185). The following month, Claimant exhibited improvement in school behavior (Tr. 283).

In February, 2006, treating notes show that Claimant was excited about joining a basketball team (Tr. 280). In March, 2006, Claimant showed academic progress and continued to play basketball (Tr. 279). However, the same month, a psychological evaluation stated that Claimant threatened to kill himself after being grounded (Tr. 166). The evaluator noted that Claimant he had been sent to the principal's office on multiple occasions for yelling at his teacher (Tr. 166). Claimant, placed into a clinic by his parents, was diagnosed with a bipolar disorder and ADD, was assigned a GAF of $20^2$ (Tr. 173).

Upon release from the clinic six days later, Claimant was prescribed Concerta, Strattera, and Risperdal (Tr. 172). Noting a history of temper tantrums and threats to others, Daushik Raval, M.D. observed that Claimant denied that he had intended to commit suicide (Tr. 176). Claimant's family situation was described as "dysfunctional" (Tr. 177). Dr. Raval assigned him a GAF of $59^3$ (Tr. 177). Counseling notes, stating that Claimant had made a "slight regression," indicate that he was

---

[2] A GAF score of 11-20 indicates some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

[3] A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

encouraged to consider the effects of manipulative statements (Tr. 277). In the week following his discharge, counseling notes state that Claimant received a "gold star for moral focus and three silver stars for all 'As' and 'Bs'" (Tr. 276). At the end of the same month, Claimant's father noted that a recent medication change had resulted in improved behavior (Tr. 273). May and June, 2006 counseling notes state that things were "going well at home" (Tr. 270-271). Dr. Raval assigned Plaintiff a GAF of $62^4$ (Tr. 242).

A June, 2006 assessment by special education instructor stated that Claimant, a third-grader, was progressing in math and reading at the third grade level (Tr. 120). The instructor, finding that she saw "more of a need for encouragement . . . than an academic need," found Claimant a "'normal' young man" and "a joy to work with" (Tr. 121, 127). She observed no problems in the following areas: "acquiring and using information," "attending and completing tasks," "interacting and relating with others," or "caring for himself" (Tr. 121-125). Treating notes from the following month state that Claimant was "torn between relationships [with] each parent," contributing "to manipulative behavior" (Tr. 267). Claimant reported only limited contact with his biological mother (Tr. 264). He was assigned a GAF of 50 (Tr. 265).

In August, 2006, Dr. Raval opined that Claimant "need[ed] to be away from his father, stepmother, and his biological mother for awhile" (Tr. 239). In September, 2006, treating notes state that Claimant had been told that he was the cause of a separation between his father and stepmother (Tr. 258). Claimant opined that he had "ruined" his father's life (Tr. 258). The following month Venkat Talasila, M.D., noting that Claimant had possibly experienced physical abuse at the hands

---

[4]GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

-5-

of one of his biological mother's former boyfriends at a younger age, opined that "severe family conflicts" affected Claimant's well-being (Tr. 237).

In January, 2007, treating notes state that Claimant's family was experiencing "a major financial change" (Tr. 253). The same month, he was disciplined for arguing with his teacher and failing to complete his homework (Tr. 252). Claimant's 2007 MEAP scores showed a mixture a proficient and "partially proficient" ratings but no need for "intensive intervention" (Tr. 143). In February, 2007, Dr. Raval, noting that Claimant had falsely told school authorities that his father assaulted him, again opined that as a result of the dysfunctional family situation, Claimant should be put into a residential treatment program (Tr. 234).

June, 2007 treating notes show that Claimant and his biological mother were successfully developing a renewed relationship (Tr. 245). Dr. Raval noted in July, 2007 that Claimant was remorseful about lying (Tr. 230). The following month, Dr. Raval opined that Plaintiff was "doing well" (Tr. 229). October, 2007 notes states that Claimant was still "hyper" and continued to throw temper tantrums on an intermittent basis (Tr. 228). A progress report from Winter term, 2008 shows that Claimant received a mixture of average, low average, and low grades (Tr. 140-141). In March, 2008, Dr. Raval noted that Claimant's misbehavior correlated with his father's attempts to reunite with Claimant's stepmother (Tr. 311). April, 2008 academic progress notes state that he needed "to work at staying on task and focused" (Tr. 146). He received mostly average grades (Tr. 147-149). His biological mother reported that he showed significant improvement after switching medications (Tr. 312).

In July, 2008, Claimant showed a "cheerful and pleasant affect" (Tr. 313). October, 2008 counseling notes state that Claimant experienced separation issues (Tr. 243). In January, 2009, Claimant, asked to stay after class for disruptive behavior, reported that he was distracted by being

teased by another student, problems at his mother's house, and his father's illness (Tr. 154). The following month, Claimant received punishment for discourteous behavior (Tr. 155). The same month, his science teacher, noting that Claimant was performing at the "C-" level, opined that he "talk[ed] too much" (Tr. 157).

### 2. Consultive or Non-Examining Sources

In July, 2006, a Childhood Disability Evaluation completed on behalf of the SSA found that Claimant's conditions of bi-polar, ADHD, and ADD did not render him disabled (Tr. 210). The assessment, performed by Ron Marshall, Ph.D., found "no limitation" in the domains of "acquiring and using information," "attending and completing tasks," and "moving about and manipulating objects" (Tr. 212-213). The assessment, noting April, 2006 inpatient psychological treatment and the social history of Claimant's family, nonetheless found that he experienced "less than marked" limitations in "interacting and relating with others," "caring for [him]self," and "health and physical well-being" (Tr. 212-213).

### 3. Material Submitted Subsequent to the ALJ's Decision[5]

In July, 2009, Dr. Raval opined that Claimant required "medications, psychotherapy, [and] structure at home and at school in order to behave well" (Tr. 315). A January 15, 2010 submission contains an opinion letter by therapist Barry Stephens in support of the childhood benefits claim. *Docket #7* at pg. 2 of 2. Stephens, noting Claimant's "long history of attention seeking behaviors, manipulation, school performance issues, opposition and defiant behavior," opined that his condition would be improved by "special services such as Sylvan Learning Center." *Id.*

---

[5] Significant portions of the newer material are duplicative of transcript records.

Plaintiff also submitted documents showing that in February, 2010, Claimant was placed into a special education curriculum after "tutoring, counseling, individual teacher assistance, assignment sheets, small group work, practical work, adapted assignments, peer assistance and change in grouping" failed to improve his performance in mainstream classes. *Docket #18* at pg. 20 of 40, *Docket #27* at pg. 6 of 6. An academic assessment found that Claimant was not demonstrating behavioral problems at school, but that "attentional and emotional/psychiatric difficulties [were] impacting his ability to be successful in the general education setting." *Id.* at pgs. 20, 28 of 40. A social worker's report from the same time period shows that Claimant was currently living with his biological father, the father's new fiancée, and the fiancée's two children. *Docket #18* at 26. In December, 2010, Dr. Raval submitted a letter on behalf of the current claim for benefits, opining that Claimant experienced marked limitations in both interacting and relating to others and attending and completing tasks. *Docket #27* at pg. 4 of 6.

### D. The ALJ's Decision

Citing the medical records submitted as of the date of his decision, ALJ Armstrong found that while Claimant experienced the severe impairments of ADHD and a learning disability, the conditions did not meet or equal any impairment listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (Tr. 14). He found that in the domain of "Acquiring and Using Information," Claimant had "less than marked limitation" (Tr. 16). In the domain of "Attending and Completing Tasks," he also found "less than marked limitation" (Tr. 17). In the domain of "Interacting and Relating to Others," the ALJ found that Claimant had "marked" limitations, citing inappropriate behavior, poor relationships with classmates, and aggression (Tr. 18). The ALJ found no limitations in the domain of "Moving About and Manipulating Objects;" less than marked limitations in the domain of "Caring for Yourself;" and no limitation in "Health and Physical Well-Being" (Tr. 19-20).

-8-

The ALJ rejected "statements concerning the intensity, persistence and limiting effects" of Claimant's limitations to the extent that they were inconsistent with his findings (Tr. 15). He noted that Claimant's grades had improved and that he participated regularly in team sports (Tr. 15).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

### Childhood Benefits

42 U.S.C. § 1382c (a)(3)(C)(I) provides that "[a]n individual under the age of 18 shall be considered disabled" if he or she "has a medically determinable physical or mental impairment

which results in marked and severe functional limitations."[6] In evaluating whether a child is disabled, the Commissioner is to consider, in sequence, whether the child claimant 1) is "doing substantial gainful activity" 2) has a severe impairment, and if so 3) has "an impairment(s) that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.924(a). In determining whether the child claimant is disabled at the third step, the Commissioner determines functional ability in six domains:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

(v) Caring for yourself; and,

(vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

To establish disability at the third step, "the impairment(s) must . . . result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." *Id.* A "marked" limitation is defined as an impairment(s) that "interferes seriously" with the ability "to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation "interferes *very* seriously" with the ability "to independently initiate, sustain, or complete activities"(emphasis added). 20 C.F.R. § 416.926a(e)(3).

---

[6]Childhood claims are subject to the same 12-month durational requirement as adult claims. 42 U.S.C. § 1382c (a)(3)(C)(i)

## ANALYSIS

### A. Substantial Evidence

Plaintiff, now proceeding *pro se,* argues generally that the ALJ erred in denying benefits to his son. Attached to the Complaint is a copy of his former attorney's Appeals Council submission ("Request for Review") asking for reconsideration of the ALJ's decision. *Docket #1* at pgs. 5-6 of 50. The Appeal's Council brief argues that 1) Plaintiff experienced "marked," rather less-than-marked limitation in "Acquiring and using information" 2) experienced marked limitation in "Attending and completing tasks" 3) experienced some degree of limitation in "Health and physical well-being." *Id.* The *pro se* claim, liberally construed, incorporates these arguments. *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)(citing *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

#### 1. Acquiring and Using Information

Contrary to Plaintiff's contention, the ALJ's finding that Claimant experienced "less than marked" limitation in this category is well supported by the record. Citing the regulatory definition of "limited functioning," the ALJ noted that at the time of the decision, Claimant's school functioning and grades were improving (Tr. 16 *citing* 20 C.F.R. 416.926a(g)(3)). School records show that Claimant's grades improved with a medication change (Tr. 273, 276). June, 2006 counseling notes indicate that things were "going well at home" (Tr. 270). The same month, Dr. Raval assigned Plaintiff a GAF of 62, denoting "mild" rather than moderate or severe cognitive problems (Tr. 242). The same month, a special education instructor found no limitation in "acquiring and using information" (Tr. 121). Later records also support the finding that Claimant did not experience marked limitation in this domain. A winter, 2008 progress report shows that

-11-

Claimant received a mixture low, low average, and average grades (Tr. 140-141). He received mostly average grades in April, 2008 (Tr. 147-149).

### 2. Attending and Completing Tasks

The ALJ's finding that Claimant experienced "less than marked" limitations in this domain is likewise well supported. He noted that while Claimant experienced concentrational deficiencies causing him to interrupt others and receive detention, he was able to participate successfully in karate and basketball (Tr. 15-16). Also supporting this finding are assessments by both a special education teacher and a non-examining source finding an absence of limitation in this domain (Tr. 122, 212). While Plaintiff was disciplined in January, 2007 for failing to complete his homework, his MEAP scores from the same school year showed no need for "intensive intervention," further supporting the finding that Claimant experienced less than marked limitation in completing school tasks (Tr. 143, 252).

### 3. Health and Physical Well-being

Plaintiff contends that the ALJ erred by finding no limitation in this domain, noting that "Claimant talks of self harm and harm to others." *Docket #1* at pg. 5 of 50. To be sure, a July, 2006 non-examining assessment found that Claimant experienced "less than marked" limitation in this domain (Tr. 213). However, substantial evidence easily supports the ALJ's conclusion. The ALJ's noted that Claimaint's physical examinations had been wholly normal (Tr. 21) *see also* 20 C.F.R. 416.926a(l)(3-4). Further, evidence suggesting that Claimant intended harm himself or others was considered in the domains of "Interacting and relating with others" and/or "Caring for yourself" in which he was given respectively "marked" and "less than marked" limitation (Tr. 15, 18, 20). Because substantial record supports the ALJ's domain findings, remand is not warranted.

**B. Sentence Six Material**

Plaintiff's submission of school and medical records subsequent to the administrative hearing is construed as a request for a "Sentence Six" remand. Under §405(g), the Court, retaining jurisdiction, may grant a Sentence Six remand only upon a showing that there is new evidence which is material and that there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*; *see also Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir.2006). Material that is not contained in the administrative transcript and is not duplicative of formerly submitted records is "new." *Street v. Commissioner of Social Security,* 390 F.Supp.2d 630, 641-642 (E.D.Mich.2005).

Large portions of the newly submitted material represent copies of school and psychological treating notes found in the records were already considered by the ALJ. Because these records are not "new," they do not support a Sentence Six remand. Albeit for different reasons, school records showing that in February, 2010, Claimant was taken out of mainstream classes and placed into a specialized program do not support a remand. February, 2010 records (post-dating the administrative decision by 11 months) are not relevant to Claimant's condition on or before the ALJ's March 2, 2009 opinion and are thus immaterial to the original determination. *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 712 (6th Cir. 1988). For the same reason, Dr. Raval's December, 2010 assessment cannot be considered.[7] *Docket #27.* If Plaintiff believes that

---

[7] Moreover, even assuming that Dr. Raval's December, 2010 opinion letter could be construed to refer to Claimant's condition before March 2, 2009, Plaintiff has provided no reason for failing to submit the letter until 18 months after the administrative decision. "[G]ood cause contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability. *Haney v. Astrue,* 2009 WL 700057, *6 (W.D.Ky. 2009)(*citing Thomas v. Secretary,* 928 F.2d 255, 260 (8th Cir., 1991)).

his son's condition has deteriorated since the time of the decision, the proper remedy is to initiate a new claim for benefits. *Sizemore,* at 712.

Likewise, an opinion letter by therapist Barry Stephens in support of the childhood benefits claim, submitted on January 15, 2010, does not present grounds for remand. *Docket #7* at pg. 2 of 2. Stephens, stating that he supported the claim for benefits, noted Claimant's "long history of attention seeking behaviors, manipulation, school performance issues, opposition and defiant behavior." *Id.* He opined that Claimant's condition would be improved by "special services such as Sylvan Learning Center." *Id.*

Stephens' account does not present new insight into Claimant's pre-administrative opinion condition. The fact that Claimant experienced academic problems and engaged in manipulative, attention seeking, and defiant behavior was well established in the original record. Plaintiff cannot show a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Sizemore, supra,* 865 F.2d at 711. Further, assuming that the letter refers to Claimant's condition before March, 2002, Plaintiff has failed to provide "good cause" for its tardy submission.

After reviewing the entire transcript, several observations are in order. First, the record shows a certain level of impairment and as such, the determination that Claimant is not disabled should not be read to trivialize his problems. Second, it appears that Claimant has received treatment and instruction from consistently competent and caring psychiatrists, counselors, and school personnel.

Third, although Dr. Raval opined four months after the administrative determination that Claimant required "medications, psychotherapy, [and] structure at home and at school in order to

behave well," it appears that Claimant's home life has been anything but structured (Tr. 315). As the summation of the school and treating records show, Claimant's behavioral and school issues from grade school forward have correlated with episodes of family turmoil. These upheavals include removal from his biological mother's home; marital problems between his father and a stepmother and the stepmother's children; the reintroduction to his biological mother and younger half siblings; the dissolution of the father's second marriage (and being told that he was the cause of the separation); and his father's workplace injury and ensuing disability. Treating sources have stated repeatedly that family problems have precipitated downturns in Claimant's functioning. Consistent with the earlier findings, February, 2010 records documenting renewed academic difficulties also show that he and his father were now living with the father's "new" fiancée and her children. *Docket #18* at pg. 26 of 40. Regrettably, it is outside the jurisdiction of this Court to ensure Claimant's parents provide him with a stable home environment.

The above observations aside, the ALJ's determination that Claimant was not disabled was within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505

(6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

          s/R. Steven Whalen
          R. STEVEN WHALEN
          UNITED STATES MAGISTRATE JUDGE

Date: January 5, 2011

_____

### CERTIFICATE OF SERVICE

I hereby certify on January 5, 2011 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on January 5, 2011: **Greg Price.**

          s/Michael E. Lang
          Deputy Clerk to
          Magistrate Judge R. Steven Whalen
          (313) 234-5217